UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NETFLIX, INC.,

           Plaintiff,

      v.

CA, INC., et al.,

           Defendants.

Case No.  21-cv-03649-EMC

**ORDER GRANTING NETFLIX'S MOTION FOR JUDGMENT ON THE PLEADINGS; AND FINDING MOOT CA'S MOTION FOR JUDGMENT ON THE PLEADINGS AND NETFLIX'S MOTION FOR LEAVE TO AMEND INVALIDITY CONTENTIONS**

Docket Nos. 134, 135, 159

The instant case (coordinated with Case No. C-22-0373 EMC) involves a patent dispute between CA (the patent holder) and Netflix (the alleged infringer). According to CA, Netflix has infringed five of CA's patents. However, at this juncture in the proceedings, there are only two patents left in the litigation: (1) the '014 patent and (2) the '938 patent. Now pending before the Court are three motions related to the '938 patent. The motions are: (1) Netflix's motion for judgment on the pleadings, in which it asks the Court to find claim 30 of the '938 patent ineligible for patent protection; (2) CA's motion for judgment on the pleadings, in which it asks the Court to reject Netflix's patent misuse defense for claim 30; and (3) Netflix's motion to amend its invalidity contentions with respect to claim 30.[1]

/ / /

/ / /

---

[1] Claim 30 is the only claim at issue for the '''938 patent. The PTAB found claims 1-29 invalid during inter partes review ("IPR"), and the Federal Circuit affirmed.

Having considered the parties' briefs, as well as the oral argument of counsel, the Court hereby **GRANTS** Netflix's motion for judgment on the pleadings. Because the Court is granting that motion, CA's motion for judgment on the pleadings and Netflix's motion for leave to amend its invalidity contentions are both moot.

## I.      FACTUAL & PROCEDURAL BACKGROUND

The application for the '938 patent was filed in March 2020; the patent issued thereafter in February 2021.[2] The '938 patent is titled "Method and System for a Networked Self-Configuring Communication Device Utilizing User Preference Information." The abstract for the patent describes the basic invention as follows:

> A **first** electronic device may enable generation, updating, and/or storage of **user configuration information**. The user configuration information may comprise information pertaining to device configuration and/or operational preferences specific to the device user and/or various use settings, connectivity, and/or use of available resources. The generation, updating, and/or storage of the user configuration information may be performed manually and/or automatically, and may be performed directly within the first electronic device and/or via networked devices, which may [be] communicatively coupled to the first electronic device. A **second** electronic device may be enabled to be communicatively coupled to the first electronic device and/or the networked devices. The second electronic device may then be enabled to download existing user configuration information from the first electronic device and/or the networked device, and the **downloaded user configuration may be utilized to configure the second electronic device**.

'938 patent, abstract (emphasis added); *see also* '938 patent, col. 3, ll. 31-48 (providing the same basic description in the specification).

The specification for the '938 patent expands on the information contained in the abstract. It contains, for example, additional discussion about what user configuration information can be or do:

> The PE device 102 may be enabled to generate, store, and/or update user configuration information that may be utilized in facilitating use of the PE device 102 by a particular user to perform requested tasks, and/or in identifying and/or authenticating the user. . . . The

---

[2] Although the application and issuance dates are 2020 and 2021, respectively, CA represents that the date of invention for the '''938 patent is actually 2007. For purposes of the pending motions, Netflix does not contend otherwise.

United States District Court
Northern District of California

> user configuration information may comprise, for example, information pertaining to device configuration and/or operational preferences specific to the device user and/or various use settings, network connectivity, service access, secure access information, network and service access information and/or preferences that are unique to particular users, and/or manner of use of available resources.  For example, the user configuration information may specify various user specific device operational preferences, comprising favorite broadcast channels and/or website, favorite games, game status information, and media consumption settings. . . .

'938 patent, col. 7, ll. 41-56; *see also* '938 patent, col. 4, ll. 37-39 (stating that "the PE device 102 may also comprise functionality that may enable performing user identification, for authentication and/or security purposes").

Only one claim in the '938 patent is at issue in the case at bar: claim 30.  The parties agree that claim 30 is a means-plus-function claim.[3]  Claim 30 covers the following invention.

> A system comprising:
>
> a plurality of computing devices connected via one or more networks;
>
> means for receiving login information corresponding to a first user;
>
> means for identifying the first user based on the login information;
>
> means for retrieving user configuration information corresponding to the first user;
>
> means for controlling provision of a media content streaming service to a first electronic device based on the user configuration information corresponding to the first user;
>
> means for updating the user configuration information corresponding to the first user based on the provision of the media content streaming service to the first electronic device;
>
> means for receiving login information corresponding to the first user from a second electronic device;
>
> means for identifying the first user based on the login information received from the second electronic device;

---

[3] *See* 35 U.S.C. § 112(f) ("An element in a claim for a combination may be expressed as a means or step for performing a specified function *without* the recital of structure, material, or acts in support thereof, and such claim *shall be construed to cover* the corresponding structure, material, or acts described in the specification and equivalents thereof.") (emphasis added).

> means for retrieving the updated user configuration information corresponding to the first user; and
>
> means for controlling provision of the media content streaming service to the second electronic device based on the updated user configuration information corresponding to the first user.

'938 patent, claim 30.

CA describes the alleged invention covered by claim 30 as follows:

> an invention that enables an electronic device in a networked system – such as a computer or smartphone – to automatically use authenticated user configuration information from another networked device to control the provision of media content. By controlling the provision of media content based on established configuration information, rather than starting cold, the patented technique provides concrete benefits related to performance, latency, and security in networked systems delivering that content.

Opp'n at 1; *see also* Opp'n at 3 (arguing that, at the time of the invention, "a user's second device would start from scratch, rather than taking into account, for example, established configuration information"; "[t]hat oversight led to resource inefficiencies and accompanying performance problems because a user's second networked device would have to renegotiate preferred or optimal means for streaming shows or movies rather than doing so based on configuration information – such as bandwidth or video resolution capabilities – already established by another device to the network"). *Accord* Opp'n at 10, 11, 23.

## II.      DISCUSSION

A.      Legal Standard

Netflix moves for judgment on the pleadings on the basis that claim 30 of the '938 patent is not patent eligible. *See* Fed. R. Civ. P. 12(c).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

United States District Court
Northern District of California

A motion for judgment on the pleadings is proper "when the moving party clearly establishes on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment as a matter of law." *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1550 (9th Cir. 1989). In reviewing a motion under Rule 12(c), the court must assume that the facts alleged by the nonmoving party are true and must construe all inferences drawn from those facts in favor of the nonmoving party. "Rule 12(c) is 'functionally identical' to Rule 12(b)(6) and [ ] 'the same standard of review' applies to motions brought under either rule." *U.S. ex rel. Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011) (citation omitted).

*Fortinet, Inc. v. Forescout Techs., Inc.*, 730 F. Supp. 3d 958, 963 (N.D. Cal. 2024).

"Patent eligibility is a question of law," though it "may be based on underlying factual findings." *GoTV Streaming, LLC v. Netflix, Inc.*, No. 2024-1669, 2026 U.S. App. LEXIS 3911, at *14 (Feb. 9, 2026); *see also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) (stating that, "[w]hile the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination"). "Like other legal questions based on underlying facts," the issue of patent eligibility "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion where the undisputed facts, considered under the standards required by that Rule, require a holding of ineligibility under the substantive standards of law." *Ancora Techs. v. HTC Am., Inc.*, 908 F.3d 1343, 1347 (Fed. Cir. 2018) (internal quotation marks omitted).

Although Netflix has moved for judgment *on the pleadings*, it filed – after briefing was completed – an administrative motion asking for leave to file supplemental *evidence* in support of its 12(c) motion. *See* Docket No. 164 (motion). The evidence consists of CA's responses to certain requests for admission related to the '938 patent (*e.g.*, admit that it does not disclose new computer hardware or a new protocol for communication between computers). The Court denies Netflix's administrative motion because a motion for judgment on the pleadings does not take into account any evidence, with certain exceptions such as information of which the Court may take judicial notice, information that the pleadings have incorporated by reference, and (given that this is a patent case) "plain claim language, written description, and prosecution history." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372-73 (Fed. Cir. 2020) (stating that, for purposes of

*Alice*, "[i]n determining what the claims are directed to and whether they are directed to an abstract idea, a court may well consult the plain claim language, written description, and prosecution history and, from these sources, conclude that the claims are directed to automating a longstanding or fundamental practice").

B.      Law on Patent Eligibility

> Section 101 of the Patent Act defines the scope of patent-eligible subject matter.  It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor."  35 U.S.C. § 101.  But the Supreme Court has long excluded from patent protection "laws of nature, natural phenomena, and abstract ideas," *Diamond v. Diehr*, 450 U.S. 175, 185 (1981), which are "the basic tools of scientific and technological work," *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972).  The Court has "described the concern that drives this exclusionary principle as one of pre-emption," since granting "a monopoly over an abstract idea" would "pre-empt use of [the idea] in all fields" and thus "impede innovation more than it would tend to promote it."  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal citations omitted).  The Court has also cautioned, however, that lower courts must "tread carefully in construing this exclusionary principle" since, "[a]t some level, 'all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas.'"  *Id.* at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012)).

*Fortinet, Inc. v. Forescout Techs., Inc.*, 543 F. Supp. 3d 814, 822 (N.D. Cal. 2021).

> A two-step analysis determines whether [a patent claim] falls outside § 101.  We ask (1) whether the claim, as a whole, is "**directed to**" patent-ineligible matter – [*e.g.*], an abstract idea – and (2) if so, whether the elements of the claim, considered individually or as an ordered combination "'**transform** the nature of the claim' into a patent-eligible **application**."

*Ancora*, 908 F.3d at 1347 (emphasis added).

"The burden to prove the ineligibility of any patent claim stays with the patent challenger at all times."  *Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1291 (Fed. Cir. 2024).  Patent ineligibility must be proven by clear and convincing evidence.  *See Tech. in Ariscale, LLC v. Razer USA Ltd.*, No. 2024-1657, 2026 U.S. App. LEXIS 147, at *10 (Fed. Cir. Jan. 6, 2026); *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018) (taking note of two *Alice* steps and stating that, at step two, "[t]he question of whether a claim element or combination of elements is

6

well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact," and "[a]ny fact, such as this one, that is pertinent to the invalidity conclusion must be proven by clear and convincing evidence").

Claim construction can be an issue where patent eligibility is being considered. "An ineligibility analysis depends on 'the language of the [] [c]laims themselves,'" and therefore a "proper understanding of what is claimed, i.e., claim construction, . . . matters for an ineligibility analysis[.] [However], at least at some stages of a case a court may *assume* the patent owner's constructions in resolving a motion for judgment of ineligibility." *GoTV*, 2026 U.S. App. LEXIS 3911, at *16 (emphasis in original). In the case at bar, there are no claim construction issues that prevent the Court from ruling on Netflix's motion. Indeed, as Netflix correctly points out, CA does not contend that "a proposed construction would change the patent-eligibility analysis." *US Pat. No. 7,679,637 LLC v. Google LLC*, No. 2024-1520, 2026 U.S. App. LEXIS 1531, *15 (Fed. Cir. Jan. 22, 2026); *see also Mobile Acuity Ltd. v. Blippar Ltd.*, 110 F.4th 1280, 1293 (Fed. Cir. 2024) ("To defeat a motion to dismiss based on the purported need for claim construction, a patentee must propose a specific claim construction . . . and explain why any dispute . . . must be resolved before the scope of the claims can be understood for § 101 purposes.").

C.     *Alice* Step One

In evaluating whether a claim is directed to an abstract idea (*Alice* step one), a court considers what the asserted advance in the patent is. *See Broadband iTV, Inc. v. Amazon.Com, Inc.*, 113 F.4th 1359, 1367 (Fed. Cir. 2024). Where software innovations are at issue, the inquiry often turns on whether the asserted invention simply uses a computer as a tool (not patent eligible) or whether there is an improvement in computer capability/functionality (patent eligible). *See Ancora*, 908 F.3d at 1347; *see also GoTV*, 2026 U.S. App. LEXIS 3911, at *24 (asking whether a claim "simply call[s] for the use of computer networks as tools to carry out an abstract idea, using their ordinary functions without specific hardware or process advances in those functions – *e.g.*, receiving inputs, storing and retrieving, processing, outputting (including displaying, and transmitting" or instead "call[s] for a concrete asserted improvement in *how* those functions are carried out, which requires more than result-focused functional language and more than just using

United States District Court
Northern District of California

those functions in the context of specifically identified content") (emphasis in original).

Importantly, if an improvement in computer capability/functionality is being claimed, the technological solution must be *specific* – and the specificity is a requirement at the first step of *Alice*. A number of Federal Circuit cases have so held. *See, e.g.*, *Broadband*, 113 F.4th at 1368 (stating that, at step one, there must be a "specific, technological solution to a technological problem"); *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1150 (Fed. Cir. 2019) (in discussing step one, noting that "[a]n improved result, without more stated in the claim, is not enough to confer eligibility to an otherwise abstract idea[;] [t]o be patent-eligible, the claims must recite a specific means or method that solves a problem in an existing technological process"); *Ancora*, 908 F.3d at 1348 (in addressing step one, stating that "[i]mproving security – here, against a computer's unauthorized use of a program – can be a non-abstract computer-functionality improvement if done by a specific technique that departs from earlier approaches to solve a specific computer problem"); *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018) (in addressing step one, noting that claims avoid being abstract where they have "the specificity required to transform a claim from one claiming only a result to one claiming a way of achieving it").

As to what constitutes sufficient specificity, there is no bright-line rule. Rather, what constitutes sufficient specificity turns on the patent at issue.

For example, in *Affinity Labs of Texas, LLC v. Amazon.com, Inc.*, 838 F.3d 1266 (Fed. Cir. 2016), the claim was "directed to a network-based media system with a customized user interface, in which the system delivers streaming content from a network-based resource upon demand to a handheld wireless electronic device having a graphical user interface." *Id.* at 1268. The Federal Circuit held that "the concept of delivering user-selected media content to portable devices is an abstract idea." *Id.* at 1269. Although the patent holder argued that the patent "embodied a concrete technological innovation because, as of its priority date . . . , wireless streaming of media was not 'routine, conventional, or well-known,'" the patent failed to

> disclose any *particular mechanism* for wirelessly streaming content
> to a handheld device. The specification describes the *function* of
> streaming content to a wireless device, but not a specific *means* for

8

performing that function.  Claim 14, in turn, recites (1) a "media managing system" that maintains a library of content, (2) a "collection of instructions" that are "operable when executed" by a handheld wireless device to request streaming delivery of the content, and (3) a "network based delivery resource" that retrieves and streams the requested content to the handheld device.  *At that level of generality, the claims do no more than describe a desired function or outcome, without providing any limiting detail that confines the claim to a particular solution to an identified problem.*  The purely functional nature of the claim confirms that it is directed to an abstract idea, not to a concrete embodiment of that idea.

*Id.* (emphasis added); *see also Koninklijke*, 942 F.3d at 1152 (stating that, "[a]bsent sufficient recitation of *how* the purported invention improved the functionality of a computer, the 'improvement' captured by [a] claim[] was recited at such a level of result-oriented generality that [the] claim[] amounted to a mere implementation of an abstract idea on a computer, not the specific way to improve the functionality of a computer") (emphasis in original).

In contrast, in *Ancora*, 908 F.3d at 1343, the Federal Circuit found that a patent was *not* directed to an abstract idea.  The patent at issue related to a method for "limiting a computer's running of software not authorized for that computer to run."  *Id.* at 1344.  The method used by the patent relied on the use of a "key" and a "record."

A "key," which is "a unique identification code" for the computer, is embedded in the read-only memory (ROM) of the computer's Basic Input Output System (BIOS) module: the key "cannot be removed or modified."  A "record" is a "license record" associated with a particular application: "each application program that is to be licensed to run on the specified computer[] is associated with a license record[] that consists of author name, program name[,] and number of licensed users (for network)."

*Id.* at 1345 (emphasis omitted).

The court held that there was sufficient specificity at *Alice* step one because the patent did not simply claim a result as the invention but rather a specific way of achieving that result.  The patent described

*where* the license record is stored in the computer and the *interaction* of that memory with other memory to check for permission to run a program that is introduced into the computer. The inventive method uses a modifiable part of the BIOS memory – not other computer memory – to store the information that can be used, when a program is introduced into the computer, to determine whether the program is licensed to run on that computer.  BIOS

9

> memory is typically used for storing programs that assist in the start-up of a computer, not verification structures comparable to the software-licensing structure embodied by the claimed invention. Using BIOS memory, rather than other memory in the computer, improves computer security, the patent indicates, because successfully hacking BIOS memory (i.e., altering it without rendering the computer inoperable) is much harder than hacking the memory used by the prior art to store license-verification information.

*Id.* The structure in the BIOS memory is "used for verification by interacting with the distinct computer memory that contains the program to be verified." *Id.* at 1348-49.

In *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303 (Fed. Cir. 2020), the Federal Circuit also held there was sufficient specificity with respect to a claimed computer functionality improvement. The patent related to "a communication system comprising a primary station (e.g., a base station) and at least one secondary station (e.g., a computer mouse or keyboard)." *Id.* at 1305. "Because many secondary stations are battery-operated, secondary stations may enter a 'park' mode and cease active communications with the primary station to conserve power." *Id.*

> In conventional systems, primary stations *alternate* between sending inquiry messages to identify new secondary stations and polling secondary stations already connected to the piconet,[4] including parked devices, to determine whether they have information to transmit. Therefore, under the conventional polling process, a secondary station could experience delays of tens of seconds both in initially joining a piconet and in transmitting data after entering park mode.

*Id.* (emphasis added). The patent at issue was an improvement over "conventional communication systems by including a data field for polling as *part* of the inquiry message, thereby allowing primary stations to send inquiry messages and conduct polling *simultaneously*." *Id.* (emphasis added).

The Federal Circuit held that the patent was not directed to an abstract idea because the claims did "not merely recite generalized steps to be performed on a computer using conventional computer activity" but rather pinpointed the means by which delay would be reduced – *i.e.*, "'adding to each inquiry message prior to transmission an additional data field for polling at least

---

[4] A piconet is an ad hoc network formed by two devices that share a common communication channel. *See Uniloc*, 957 F.3d at 1305.

10

one secondary station.'" *Id.* at 1308. "The claimed addition of a data field for polling to the inquiry message significantly reduces the response time, enabling secondary stations to respond a fraction of a second later." *Id.* at 1309.

In the instant case, CA asserts that, at *Alice* step one, claim 30 is not directed to an abstract idea but rather to a specific improvement in computer functionality – *i.e.*, reducing latency. *See* CA Compl. ¶ 109 (alleging that "[t]he methods and systems described in the '938 Patent improve the functionality of a networked computer system by reducing latency [*i.e.*, delay] in a video signal processing system"). Netflix questions whether that is, in fact, the alleged improvement, noting that the specification for the '938 patent does not expressly reference latency, that there is no discussion in the patent of any problems with the prior art, and that the "Background of the Invention" section simply takes note that wireless technology has become prevalent. In response, CA argues that there is no requirement that a patent specification expressly identify the advancement over the prior art and that, in any event, it can reasonably be inferred what the improvements are. *See* Opp'n at 18 (asserting that "[i]mprovements related to 'connectivity, and/or use of available resources' implicate latency by definition").

For purposes of the pending motion, the Court need not dwell on what the exact claimed improvements are. Claim 30 teaches that user configuration information for one electronic device is updated, and that the updated information is then used in another device. Thus, it is fair to characterize claim 30 as being directed to the efficiency of devices in a computer system. As CA itself suggests, the invention essentially allows for "copying" of user configuration information from device 1 to device 2, *i.e.*, so that user configuration information does not have to be restarted for device 2. *See* Opp'n at 1 (describing the alleged invention as one that "enables an electronic device in a networked system – such as a computer or smartphone – to automatically use authenticated user configuration information from another networked device to control the provision of media content); Opp'n at 10-11 (stating that claim 30 is "directed to generating or updating certain authenticated 'user configuration information' from a 'first electronic device' and then using that information in a 'second electronic device' to 'control[] provision of the media content' in order to improve connectivity resource management, latency, and security in the

claimed networked computer system"); Opp'n at 11 (indicating that the advancement over the prior art is as follows: "conventional networked systems boot up blind to deliver media content, renegotiating user connectivity settings in each device from square one, rather than using established connectivity settings to, for example, optimize video quality"); *see also* Opp'n at 5 (stating that CA's expert opined that "'the asserted claims of the '938 Patent relate to the ability to seamlessly adjust the quality of the delivered content based on the reproduction capabilities of a receiving device'").

To the extent CA argued, at the hearing, that updating of user configuration information is also a critical part of the alleged invention, that is belied by CA's description of the invention in its papers, which (as indicated above) focuses on the copying of updated user configuration information instead. *Cf.* Tr. at 32 (asserting that user configuration information is discerned automatically and then stored but then adding "those are just the threshold issues before we get to the *bigger steps*") (emphasis added). Furthermore, on its face, the '938 patent states that, under the alleged invention, updating can be done automatically *or manually*. *See* '938 patent, col. 14, ll. 60-63 (stating that "[t]he generation, updating, and/or storage of the user configuration information may be performed manually and/or automatically, and may be performed directly within the PE device 202a and/or via the networked device 204"); *see also* '938 patent, col. 11, ll. 36-57 (stating that the generation of user configuration information may be performed automatically or manually, and that the same is true for the updating of such information); '938 patent, col. 13, ll. 18-col. 14, l. 1(stating that the user configuration information may be uploaded automatically or manually, and that the same is true for the updating of such information and the downloading of such information). The fact that updating can be done manually further undercuts CA's suggestion that updating is a critical part of the invention.[5] In any event, updating information is also an abstract idea, *cf. AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th

---

[5] At the hearing, CA repeatedly asserted that user configuration information is not updated manually but rather automatically (self-configuring) based on the provision of the media content streaming service. *See* Tr. at 19-20, 25-26, 32. But claim 30 on its face does not state that the updating is done automatically, and the patent specification repeatedly notes that the updating can be done automatically or manually.

United States District Court
Northern District of California

1371, 1378 (Fed. Cir. 2024) (noting that "the steps of obtaining, manipulating, and displaying data, particularly when claimed at a high level of generality, are abstract concepts"), and, again, using a computer to make updating more efficient (automatic instead of manual) cannot make the claim less abstract.[6]

To be sure, CA argues that claim 30 is directed to an improvement in computer functionality, and improvements to computer functionality are commonly patentable. But to be patent eligible, the claim must have *specificity* as to how that improvement is accomplished (even at *Alice* step one). Here, given that the critical aspect of the alleged invention is "copying," the question is *how* the copying of user configuration information from device 1 to device 2 accomplished. In its papers, CA states: "The means to achieve these solutions are recited in the written description (because claim 30 is a means-plus-function claim) and the claim itself." Opp'n at 12. But this statement is entirely conclusory in nature. CA does not point to any specific part of the specification that addresses how the copying is done; nor does claim 30 on its face address how the copying is done other than to say there is communication involved between device 1, the network, and/or device 2. *See GoTV*, 2026 U.S. App. LEXIS 3911, at *23 ("We have . . . held claims using purely 'result-focused functional language, containing no specificity about how the purported invention achieves those results,' to be directed to an abstract idea"); *Two-Way Media*, 874 F.3d at 1337 (noting that the claim language required "the functional results of 'converting,' 'routing,' 'controlling,' 'monitoring,' and 'accumulating records'" but did not "sufficiently describe how to achieve these results in a non-abstract way"). The lack of any description as to how the copying is to be performed is particularly problematic given CA's own concession that copying is the "bigger step[]" in the alleged invention. Tr. at 32.

When the Court asked CA, at the hearing, to point to specificity as to how the copying of updated user configuration information is to be performed, CA suggested that columns 9 and 10 of the '938 specification provide the requisite specificity. But the relevant text simply underscores

_____

[6] There is also no indication in claim 30 or the patent specification as to how updating "based on the provision of the media content streaming service," '938 patent, claim 30, is done. And nothing indicates reliance on media content streaming service to obtain user information is novel and non-routine.

United States District Court
Northern District of California

United States District Court
Northern District of California

how specificity is lacking.  That "[t]he user configuration manager 168 may comprise *suitable* logic, circuitry and/or code that enables performing of management and/or control operations pertaining to the user configuration information," '938 patent, col. 9, ll. 61-64 (emphasis added), says nothing about what logic, circuity, or code is used.  It is a complete black box.  *See Dropbox, Inc. v. Syncronoss Techs., Inc.*, 815 Fed. Appx. 529, 533 (Fed. Cir. 2020) (stating that the claimed advance of an "access checker" was "nothing but a functional abstraction," and "[t]he specification . . . does little to . . . define this abstraction as a technological solution[;] [i]nstead, the specification largely treats the 'access [checker or] filter' as a black box"); *People.AI, Inc. v. SetSail Tech., Inc.*, 575 F. Supp. 3d 1193, 1207 (N.D. Cal. 2021) (noting that "[t]he claim's disclosure of a 'match score' is . . . a black box for performing the desired abstract function" because the specification simply stated that "the system should compare the data in the communication with the data in a data profile, and that comparison could weigh different datapoints differently," but the specification did not "describe *how* the match score should be constructed"; consequently, "the claim invokes a structure but, in substance, is directed to a particular end result") (emphasis in original).

To the extent CA relies on FIG. 3 of the patent – because it purportedly "discloses an algorithmic structure for achieving an exemplary embodiment of the claimed system," Opp'n at 5; *see also* '938 patent, col. 14, ll. 13-16 (stating that FIG. 3 is "a flow chart that illustrates use of stored user preference information to configure a secondary personal electronic (PE) device, in accordance with an embodiment of the invention") – FIG. 3 does no more than repeat the generalized language of the abstract and thus is insufficient.  No circuit, logic, or algorithm is described.  It is nothing more than a schematic with conclusory labels.

CA posits that the instant case is analogous to *Uniloc* and *Fortinet*, where the Federal Circuit and this Court, respectively, found at *Alice* step one that there was sufficiently specific information about how the improvement to computer functionality was accomplished.  But both cases are distinguishable.  As discussed above, in *Uniloc*, the improvement was a reduction in delay in communications made by a communications system.  There was more than just generalized information as to how that reduction was accomplished: in particular, while the prior

14

art systems alternated between sending inquiry messages and polling secondary stations, the invention claimed did these tasks simultaneously by including a data field for polling as part of the inquiry message. *See Uniloc*, 957 F.3d at 1305.

As for *Fortinet*, the relevant patent was related to a security system that regulated access to resources on a data network. Like the patent in *Uniloc*, the patent in *Fortinet* provided more than just a generalized description as to how access was regulated or controlled; rather, it provided specificity as to what information was considered in determining whether access would be given. For example, while the prior art determined network resource access based solely on the identity of the client and the path through which he was connecting, the patent at issue also considered the device that the client was using to access the system. In addition, permission to access was based on a dynamic security database which had certain rules, thus allowing for consideration of, *e.g.*, history of network resource access authorization requests.[7] *See Fortinet*, No. C-20-3343 EMC (Docket No. 335) (Order at 13-14).

*GoTV*, a recent decision from the Federal Circuit, also weighs in Netflix's favor. In *GoTV*, the plaintiff sued Netflix for infringement of patents that claimed

> methods and systems involving a server that receives a request for content from a wireless device, delivers the requested content to the device for the device to render (*i.e.*, for visual content, to place on the device's screen), and has tailored the specifications for the to-be-rendered content to the screen size or other capabilities of the requester's device.

*GoTV*, 2026 U.S. App. LEXIS 3911, at *1-2. The patents addressed a problem with the prior art: "Because wireless devices vary in screen size, resolution, color pallets, and other properties . . . , it was known that the quality of a display of content from a software application on a particular device is improved by tailoring the display specifications . . . to the capabilities of the device displaying the content." *Id.* at *4. But "building applications 'from the group up' for each type of

---

[7] At the hearing, CA provided slides making comparisons between the language of the claim at issue in Fortinet and the claim at issue in the case at bar. But that comparison makes little sense because the *Fortinet* patent was ultimately directed to factors that should be considered in determining whether access should be given to resources. Here, the '''938 patent is not directed to such but rather to improving performance in media content streaming via copying (even if part of the performance includes security). The patents are not analogous.

15

United States District Court
Northern District of California

wireless device" was costly and time consuming. *Id.* at *5.

> The patents propose[d] to reduce the device-specific-tailoring burden by introducing a server that, when a user requests certain application content, accesses a version of that content containing at least some "generic" display specifications – "generic" simply meaning "not specific to any device or any set of device capabilities" – and performs tailoring of the display specifications to capabilities of the requesting wireless device.

*Id.*

The Federal Circuit held that, at *Alice* step one,

> the representative claim is directed to the abstract idea of a template set of specifications – generic in at least some respects . . . – that can be tailored (in at least one respect) for final production of the specified product (here an image) to fit the user's constraints. Outside the image context, the idea is familiar from, say, a pattern specifying many but not all details for a dress or trousers (with tailoring for final production to fit a particular body in limb length or other body dimensions) or a kitchen-cabinet blueprint (tailorable to height and length wall measurements).

*GoTV*, 2026 U.S. App. LEXIS 3911, at *25-26; *see also id.* at *23 (noting that "we have often recognized claims directed to 'a longstanding or fundamental human practice' to be directed to an abstract idea," and the same is true for "claims using purely 'result-focused functional language, containing no specificity about how the purported invention achieves those results'"; also, "we have made clear that an abstract idea remains an abstract idea even when narrowed – *e.g.*, by subject matter – to a particular use or environment").

As Netflix rightly argues, the instant case is similar to *GoTV* in that the idea of copying user configuration information from one device to another is a familiar concept that shows up in the real world. *See id.* at *23 (noting "we have often recognized claims directed to 'a longstanding or fundamental human practice' to be directed to an abstract idea"). For example, banks

> routinely receive[] a customer's identification information when the customer visits a branch or accesses the bank's website on an electronic device; use[] that information to authenticate the customer and retrieve service-related information specific to the customer (*e.g.*, account number and/or balance) to control provision of service (*e.g.*, process or decline to process a deposit a withdrawal, generate a statement, or charge a fee); update[] the customer's service-related information (*e.g.*, account balance); and, when the customer visits another branch or accesses the bank's website on another device, used the customer's information again to control provision of service in the second setting.

16

Mot. at 8-9; *see also* Mot. at 9 (also discussing hotel loyalty programs and airline frequent flyer loyalty programs). *Accord Beteiro, LLC v. DraftKings Inc.*, 104 F.4th 1350, 1356 (Fed. Cir. 2024) (stating that "the district court was able to persuasively analogize Beteiro's patent claims to longstanding 'real-world' ('brick and mortar') activities[;] [a] claimed method's similarity to 'fundamental . . . practices long prevalent' is yet another clue that the claims may be abstract and unpatentable"); *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307, 1314 (Fed. Cir. 2016) (noting that "it was long-prevalent practice for people receiving paper mail to look at an envelope and discard certain letters, without opening them, from sources from which they did not wish to receive mail based on characteristics of the mail"; "[c]haracterizing e-mail based on a known list of identifiers is no less abstract").

Accordingly, the Court finds that, at *Alice* step one, claim 30 of the '938 patent is directed to an abstract idea. Although CA asserts that the claim is directed to an improvement in computer functionality, it provides no specifics whatsoever as to how that improvement is accomplished and simply focuses on the results: that user configuration information is copied from device 1 to device 2.

D.      *Alice* Step Two

At *Alice* step two, a court considers "whether the elements of the claim, considered individually or as an ordered combination transform the nature of the claim into a patent-eligible application." *Ancora*, 908 F.3d at 1347 (internal quotation marks omitted added). "These transformative elements must supply an inventive concept that ensures the patent amounts to significantly more than a patent upon the [ineligible concept] itself. Claim limitations that recite conventional, routine and well understood applications in the art are insufficient to supply an inventive concept." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1289-90 (Fed. Cir. 2018) (internal quotation marks omitted).

In the instant case, Netflix has met its burden in showing, by clear and convincing evidence, there is no inventive concept at step two. First, as indicated above, an inventive concept must, by definition, be more than just the abstract idea. But here, CA's description of the alleged inventive concept is no different from the abstract idea, describing a basic function performed by

17

computers without providing any specificity as to how the claimed improvement in that function is effectuated. *Compare* Opp'n at 10-11 (discussing what claim 30 is directed to (step one): "specific improvements in computer networks delivering media content," in particular, "generating or updating certain authenticated 'user configuration information' from a 'first electronic device' and then using that information in a 'second electronic device' to 'control[] provision of the media content' in order to improve connectivity resource management, latency, and security in the claimed networked computer system"), *with* Opp'n at 21 (discussing what the alleged inventive concept is (step two): "automatically generating authenticated user configuration information from one networked device to control provision of media content on another authenticated networked device").

Second, there is no inventive concept because CA is simply claiming the performance of an abstract idea on a set of generic computer components. *See BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1348 (Fed. Cir. 2016) ("An abstract idea on 'an Internet computer network' or on a generic computer is still an abstract idea."); *see also Affinity*, 838 F.3d at 1260 ("In addressing computer-implemented patents, the *TLI* court contrasted claims that are directed to an improvement in the functioning of a computer with claims that 'simply add[] conventional computer components to well-known business practices' or consist only of 'generalized steps to be performed on a computer using conventional computer activity.'"). The '938 patent specification explicitly states that the asserted invention "may be realized in hardware, software, or a combination [thereof]" **and** that

> [a]ny kind of computer system or other apparatus adapted for carrying out the methods described herein is suited. A typical combination of hardware and software may be a general-purpose computer system with a computer program that, when being loaded and executed, controls the computer system such that it carries out the methods described herein.

'938 patent, col. 15, ll. 16-27. Given this express statement in the patent and the lack of any description as to an inventive circuit, software, algorithm, or other means of implementation, no factual determinations need to be made as to whether a claim limitation is well understood, routine, and/or conventional. *See GoTV*, 2026 U.S. App. LEXIS 3911, at *31 (indicating that, at

United States District Court
Northern District of California

United States District Court
Northern District of California

*Alice* step two, whether a claim limitation is well understood, routine, and conventional can be a factual determination).  The patent concedes on its face that only generic computers are used in the invention, and it specifies nothing inventive that is not well understood, routine, and/or conventional.

Based on its analysis of *Alice* steps one and two, the Court concludes that claim 30 of the '938 patent is not patent eligible.  It is directed to an abstract idea and there is no inventive concept that transforms the abstract idea into a patent-eligible application.  *Cf. Esignature Software, LLC v. Adobe, Inc.*, 656 F. Supp. 3d 1041, 1049 (N.D. Cal. 1041) (noting that, where the invention claims an improvement in computer capability, *Alice* steps one and two "can blend together"); *see also Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) ("recogniz[ing] that, in other cases involving computer-related claims, there may be close calls about how to characterize what the claims are directed to," and, "[i]n such cases, an analysis of whether there are arguably concrete improvements in the recited computer technology could take place under step two").

E.    Futility

The only issue remaining is whether the Court should permit CA to amend.  The Court shall not permit amendment because, based on the claim language and patent specification, amendment would be futile.  *See Receivership Estate of AudienceScience Inc. v. Google LLC*, No. 22-cv-4756, 2024 U.S. Dist. LEXIS 80585, at *37 (N.D. Cal. May 2, 2024) ("[B]ecause the Court's finding[] in each step of the *Alice* analysis is based on the language of the Patents-In-Suit, it finds that amendment of the Complaint would be futile.").  The Court's decision that claim 30 is patent ineligible is based solely on the claim language and the patent itself.  There are no claim construction issues that might suggest a different result could be possible.

### III.    CONCLUSION

For the foregoing reasons, the Court grants Netflix's motion for judgment on the pleadings.  Claim 30 of the '938 patent is not patent eligible.  Because the Court is granting Netflix's motion, it need not rule on either (1) CA's motion for judgment on the pleadings (regarding the patent misuse defense as asserted by Netflix with respect to claim 30) and (2) Netflix's motion to amend its invalidity contentions (for claim 30).  Both motions are moot.

At this juncture, the only patent that remains in this litigation is the '014 patent. All relevant claims for that patent were found invalid during IPR. CA intends to appeal or has already appealed the PTAB's decision to the Federal Circuit. Given these circumstances, the Court **STAYS** this litigation pending the resolution of the appeal.

This order disposes of Docket Nos. 134, 135, and 159, as well as Docket Nos. 164 (denied) and 165 (moot).

**IT IS SO ORDERED**.

Dated: March 18, 2026

_____
EDWARD M. CHEN
United States District Judge